## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ERIKA S.,[1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     No. 23-cv-2418 (GMH) |
| | ) |
| MARTIN O'MALLEY, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Plaintiff Erika S. filed this action seeking to reverse the final decision of the Commissioner of Social Security, Martin O'Malley ("Defendant" or "the Commissioner") denying her application for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") benefits under Titles II and XVI of the Social Security Act. 42 U.S.C. §§ 405(g), 1383(c)(3). Plaintiff alleges that the Administrative Law Judge ("ALJ") who decided her claim disregarded the findings and opinions of her treating physicians—in violation of the "treating physician rule"—in determining that she is not disabled. Plaintiff additionally alleges that the ALJ's determination is not supported by substantial evidence because the ALJ failed to fully and accurately describe Plaintiff's condition to the vocational expert on whose testimony she relied. Plaintiff requests a reversal of the ALJ's decision or, in the alternative, a remand for a further

---

[1] Plaintiff's name has been partially redacted in accordance with the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States. *See* Memorandum from Hon. Wm. Terrell Hodges, Chair, Comm. on Ct. Admin. & Case Mgmt. to Chief Judges of the U.S. Cts. of Appeals, Chief Judges of the U.S. Dist. Cts., Clerks of the U.S. Cts. of Appeals, and Clerks of the U.S. Dist. Cts. (May 1, 2018), https://www.uscourts.gov/sites/default/files/18-ap-c-suggestion_cacm_0.pdf [https://perma.cc/N9T2-U5XG].

hearing.  The Commissioner takes the opposite position and urges affirmance of the ALJ's ruling.

Upon consideration of the parties' briefs and the administrative record, the Court grants Plaintiff's

motion and denies Defendant's motion.[2]

## I.  BACKGROUND

### A.  Statutory and Regulatory Framework

To be eligible for SSI benefits and DIB under the Social Security Act, the SSA must find a

claimant to be "disabled," meaning that the individual is "unable to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can

be expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than twelve months."   42 U.S.C. §§ 423(d), 1382c(a)(3)(A).   To make that

determination, an ALJ gathers evidence, holds a hearing, takes testimony, and performs the

following five-step, sequential inquiry of the disability claim:

Step one: whether the claimant is engaging in "substantial gainful activity";[3]

Step two: whether the claimant has a "severe" medically-determinable physical or mental impairment or combination of impairments;[4]

---

[2] The relevant docket entries for purposes of this Memorandum Opinion are: (1) the administrative record, ECF No. 5; (2) Plaintiff's Motion for Judgement of Reversal, or, in the Alternative, Remand, ECF No. 11; (3) Defendant's Motion for the Judgment of Affirmance and in Opposition to Plaintiff's Motion for Judgment of Reversal, ECF No. 15; and (4) Defendant's Reply Brief in Support of Motion for Judgment of Reversal, or, in the Alternative, Remand, ECF No. 18. The page numbers cited herein are those assigned by the Court's CM/ECF system.

[3] "Substantial gainful activity" is work that "involves doing significant and productive physical or mental duties" and is "done (or intended) for pay or profit." 20 C.F.R. § 416.910; *see also* 20 C.F.R. § 404.1510 (defining "substantial gainful activity" for the purposes of Social Security DIB claims). "If [the claimant is] doing substantial gainful activity, [the Social Security Administration ("SSA")] will find that [the claimant is] not disabled." 20 C.F.R. § 416.920(a)(4)(i); *see also* 20 C.F.R. § 404.1520(a)(4)(i) (defining the step one inquiry for DIB claims).

[4] An impairment or combination of impairments is "severe" if it "significantly limit[s]" a claimant's "physical or mental ability to do basic work activities," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "seeing, hearing, [or] speaking"; "[u]nderstanding, carrying out, and remembering simple instructions"; exercising judgment; "[r]esponding appropriately to supervision, co-workers[,] and usual work situations"; or "[d]ealing with changes in a routine work setting." 20 C.F.R. § 416.922; *see also* 20 C.F.R. § 404.1522 (defining a severe impairment for the purposes of DIB claims).

Step three: whether the claimant's impairment is equivalent to one of the disabling impairments listed in the appendix of the relevant regulation, 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings");

Step four: whether the impairment prevents the claimant from performing his or her past relevant work; [5] and

Step five: whether the claimant, in light of his or her age, education, work experience, and RFC— i.e., the most he or she is able to do notwithstanding his or her physical and mental limitations—is unable to perform another job available in the national economy.[6]

*See* 20 C.F.R. § 416.920; *see also* 20 C.F.R. § 404.1520 (outlining the five-step sequential inquiry for DIB claims); *Butler v. Barnhart*, 353 F.3d 992, 997 (D.C. Cir. 2004). "An affirmative answer to question 1 or negative answers to questions 2 or 4 result in a determination of no disability. Affirmative answers to questions 3 or 5 establish disability." *Hines v. Brown*, 872 F.2d 56, 58 (4th Cir. 1989).

The claimant bears the burden of proof at the first four steps of the evaluation. *Callahan v. Astrue*, 786 F. Supp. 2d 87, 89 (D.D.C. 2011). At step five, the burden shifts to the Commissioner to identify specific jobs available in the national economy that the claimant can perform. *Id.* In making this determination, an ALJ may call a vocational expert to testify at the hearing as to

---

[5]"Past relevant work" is work "done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn to do it." 20 C.F.R. § 416.960(b)(1); *see also* 20 C.F.R. § 404.1560(b)(1) (defining "past relevant work" for the purposes of DIB claims). If the claimant can perform his or her past relevant work, a finding of "not disabled" is mandated. 20 C.F.R. § 416.920(a)(4)(iv); *see also* 20 C.F.R. § 404.1520(a)(4)(iv) (defining the step four inquiry for DIB claims).

[6] At the fifth step, the ALJ may, "[i]n the ordinary case, . . . resort[] to the applicable medical vocational guidelines" (also known as "the grids") to determine whether the claimant is disabled. *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999) (quoting *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986)); see also 20 C.F.R. Pt. 404, Subpt. P, App. 2. "The grids 'take[ ] into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience." *Rosa*, 168 F.2d at 78 (alteration in original) (quoting *Zorilla v. Chater*, 915 F. Supp. 662, 667 (S.D.N.Y. 1996)). However, when a claimant has additional limitations beyond those contemplated by the grids, the ALJ cannot rely on the grids alone to establish non-disability. *Id.* In such cases, the testimony of a vocational expert is generally required. *Smith v. Bowen*, 826 F.2d 1120, 1122 (D.C. Cir. 1987).

whether, based on the claimant's RFC, he or she can perform other work that exists in the national economy.[7]  *Id.* at 90.

### B.    Plaintiff's Disability Claims and Procedural History

Plaintiff was born on July 25, 1977, and was 41 years old on her alleged disability onset date of October 30, 2018. ECF No. 5-2 at 49, 57.  She has at least a high school education and had been working as a food service worker from December of 2016 to September of 2018 before the alleged onset of her disability.  ECF No. 5-2 at 71.

Plaintiff filed applications for DIB and SSI benefits on January 2, 2019.  ECF No. 5-5 at 6–21.  She claimed that since October 30, 2018, she had been disabled due to a hole in her bladder, bladder spasms, and uncontrollable urination resulting from complications arising from gender affirming/reassignment surgery in October 2018.[8]  ECF No. 5-6 at 4.  Plaintiff's claim was denied initially in May 2019.  ECF No. 5-3 at 24.  On appeal, she also alleged depression resulting from her "pain and situation."  ECF No. 5-6 at 33.  Plaintiff's request for reconsideration was denied in November 2019.  ECF No. 5-3 at 54, 58.  Plaintiff then filed a request for a hearing in November 2019.  ECF No. 5-3 at 61.

On August 24, 2021, the claimant testified at a telephonic hearing before an ALJ.  *Id.*  In September 2021, the ALJ issued a decision denying Plaintiff's disability claim.  ECF No. 5-3 at 71.  Five days later, Plaintiff submitted an appeal to the Appeals Council, ECF No. 5-4 at 215, which remanded Plaintiff's case for resolution of the following issue:

---

[7] In determining whether "unskilled, sedentary, light, and medium jobs exist in the national economy" that a claimant can perform, a VE may rely on the Dictionary of Occupational Titles, 20 C.F.R. § 404.1566(d)(1), which "provides a brief description of occupations within the national economy and lists the capabilities that each occupation requires of a worker."  *Callahan*, 786 F. Supp. 2d at, 90.

[8] The parties used different terms to describe Plaintiff's surgery.  Plaintiff refers to it as "gender affirming" surgery; the government uses the term "gender reassignment" surgery.  The ALJ uses the latter term.  Other than when quoting the parties briefs or record, the Court will use the term gender affirming/reassignment surgery.

> The record contains inconsistencies regarding the claimant's fistulas, bladder spasms, and bladder leakage/incontinence since undergoing gender reassignment surgery in 2018.  The Administrative Law Judge found no severe physical impairments (Finding 3), but inconsistently found claimant's impairments caused limitations in the ability to perform work-related activities, and limited the claimant to light exertion level work (Decision, page 5; Finding 5).  Further evaluation of claimant's symptoms, physical impairments, and their impact on the claimant's ability to perform functional work tasks is required.

ECF No. 5-3 at 79–81.

A second administrative hearing occurred on February 22, 2023, before a different ALJ.  ECF No. 5-2 at 47.  At the hearing, Plaintiff testified that she was previously employed in multiple roles at a nonprofit from June 2004 to April 2010, as a ticket taker at Nationals Stadium from March 2014 to July 2015, as a dispatcher for Metro Access from February 2015 to April 2016, and, most recently, as a food service worker between December 2016 and 2018.  ECF No. 5-2 at 72–73.  As the result of complications arising from gender affirming/reassignment surgery undergone in October 2018, Plaintiff stated that she feels pain in the vaginal area and suffers continued incontinence and bladder spasms, resulting in her requiring bathroom breaks roughly every 30 to 45 minutes.  *Id.* at 82–83.  According to Plaintiff, she can lift only up to five pounds before it feels like she is "pulling something in [her] groin area."  *Id.* at 77.  She also testified that she has trouble pushing and pulling objects, can climb only seven steps before stopping, can walk for only five minutes before stopping, and can stand for only ten minutes before stopping due to pain in the vaginal area.  *Id.* at 76–77.  She testified that she could sit for only 30 to 40 minutes in a car before needing to stand up and walk around or use a restroom.  *Id.*  She testified that during two car trips taken in 2022 from Washington D.C. to Greenville, North Carolina, and from D.C. to Tampa, Florida, she lied down in the back seat, rather than sat, and asked the driver to pull off the highway around once every hour so that she could use the restroom.  *Id.* at 75–76.  About her daily activities, Plaintiff stated that she does not drive, does not take public transportation, no longer pursues

hobbies, does not cook except for the use of a microwave, does not wash dishes (instead using plastic utensils and paper plates), rarely cleans, and spends a typical day in bed.  ECF No. 5-2 at 72–80.  She also testified that she no longer goes to the library, but, when driven by her niece or friend, she attends religious services three times a month, goes grocery shopping, and goes to the laundromat.  *Id.*

Plaintiff then testified about her mental symptoms, which she stated have become more intense since her surgery in 2018.  *Id.* at 83–84.  She claims that she has trouble concentrating, that she cannot focus, and that her mind starts wandering when she is doing anything.  *Id.* at 77–78.  She also testified that because of fear of being around other people, she no longer spends time with friends and has issues getting along with others.  *Id.* at 78, 81.  Further, she claims that she has stopped taking the bus and subway due to her anxiety.  *Id.* at 81.  She stated that she experiences flashbacks and intrusive thoughts as symptoms of PTSD, and depressive episodes that cause her to not want to do anything and remain in bed all day, and to want to hurt herself and others "all the time."  *Id.* at 84–85.  These depressive episodes, she testified, have caused her to stay away from other people since "the littlest thing" can cause her to become angry and want to harm them or herself.  *Id.* at 85.

Next, the ALJ asked a VE to classify Plaintiff's past work and answer a series of hypothetical questions.  *Id.* at 90–94.  The VE explained that Plaintiff's past work at the nonprofit was a combination of a social services aide and receptionist, and performed up to a light exertional level.  *Id.* at 90.  The VE explained that Plaintiff's past work as a ticket taker was performed up to a light exertional level, and her past work as a dispatcher was performed at a sedentary exertional level.  *Id.*  Lastly, the VE explained that Plaintiff's past work as a food service worker was a

composite of cook helper and a counter attendant, cafeteria, and performed up to a light exertional level.  *Id.*

The ALJ then posed a hypothetical individual of Plaintiff's age, education, and work assistance who is limited to a light exertional level of work.  *See* ECF No. 5-2 at 91–92; 20 C.F.R. § 404.1567(b).  The hypothetical individual could only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; could never climb ladders, ropes, and scaffolds; would need to avoid concentrated exposure to extreme cold, wetness, hazardous moving machinery, and unprotected heights; could perform simple, routine, and repetitive tasks in a low stress work environment, defined as no strict production quotas and no assembly line work; could only occasionally interact with the public, co-workers, and supervisors; and could tolerate only occasional changes in a routine work setting.  ECF No. 5-2 at 92. The VE testified that such a hypothetical individual could not perform Plaintiff's past work as it was actually performed or as it is customarily performed in the national economy.  *Id.*  The VE additionally testified that such a hypothetical individual could perform alternative jobs available in the national economy, namely that of a routing clerk or router, a marker, and collator operator. The ALJ then posed a second hypothetical individual with the same attributes as the first, except that this hypothetical individual could perform only at a sedentary, rather than light, physical exertional level.  *See* 20 C.F.R. § 404.1567(a); ECF No. 5-2 at 93.  The VE responded that such an individual could also perform alternative jobs available in the national economy, including that of a document preparer, microfilming; and an addressing clerk.  ECF No. 5-2 at 93–94.

Plaintiff's attorney then posed questions to the VE.  *Id* at 94.  Among other questions, Plaintiff's attorney asked whether a hypothetical individual could find employment with the same limitations as the first hypothetical individual but who additionally needed a ten-minute bathroom

break approximately every 45 minutes throughout the workday.  *Id.* at 94–95.  The VE responded

that there were no jobs available in the national economy for such an individual because he or she

would not be able to keep up with productivity expectations, regardless of whether the job required

performance at light or sedentary exertional level.  *Id.* at 95.

###### C.      The ALJ's Decision

The ALJ issued his decision on March 2, 2023.  *Id.* at 44.  The decision denied Plaintiff

disability benefits, finding that she was not disabled from October 30, 2018, through the date of

the decision.  *Id.* at 48.  On May 2, 2023, Plaintiff requested review of the ALJ's decision by the

Appeals Council.  *Id.* at 24.  On June 16, 2023, the Appeals Council denied Plaintiff's request for

review; with this decision, the ALJ's decision became the final decision of the Commissioner of

Social Security.  *Id.* at 17.  The summary of that decision that follows focuses on the issues that

are the subject matter of Plaintiff's appeal and this Memorandum Opinion.

###### 1.      Substantial Gainful Activity, Severe Impairments, and the Listings

In his decision, at step one of the five-part sequential analysis, the ALJ found that Plaintiff

had not engaged in substantial gainful activity since October 30, 2018, the alleged onset date of

her disability, following gender affirming/reassignment surgery on October 24, 2018.  *Id.* at 49;

ECF No. 5-6 at 12.  At step two, the ALJ found that Plaintiff had the following "severe"

impairments: status-post bilateral orchiectomy, status-post penectomy/urethroplasty/urethral

repair/labioplasty/vaginoplasty/valvuloplasty/clitoroplasty and scrotal skin graft, status-post

bilateral percutaneous nephrostomy tube implantation and removal, gender dysphoria, major

depressive disorder, PTSD, borderline personality disorder, and adjustment disorder.  *Id.* at 50.  He

did not find that Plaintiff's urinary incontinence was a severe physical impairment because he

concluded that "[o]nce the [urethrovaginal] fistula healed [by December 2019], she was continent." *Id.*

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  *Id.*  Specifically, he considered Listing 12.04 for depressive, bipolar, and related disorders; Listing 12.06 for anxiety and obsessive-compulsive disorders; Listing 12.08 for personality and impulse-control disorders; and Listing 12.15 for trauma- and stressor-related disorders.  *Id.*  In making this finding, the ALJ considered whether the "paragraph B" criteria were satisfied, finding that Plaintiff had a moderate limitation in understanding, remembering, or applying information; a moderate limitation in interacting with others; a moderate limitation in concentrating, persisting, or maintaining pace; and a moderate limitation in adapting and managing herself.[9]  *Id.* at 50–51.  Because Plaintiff's mental impairments did not cause at least two "marked" limitations or one "extreme" limitation in the four areas of mental functioning, the ALJ found that the paragraph B criteria were not satisfied.  *Id.*  As part of that analysis, the ALJ repeatedly relied on his finding that Plaintiff "remains able to microwave foods, ride on the subway alone, cook, wash laundry by hand, manage money, go to the library, attend religious services, grocery shop, wash laundry at the laundromat and clean," as well as her purported statement that "she socializes with friends on a regular basis and has no problems being in public by herself."  *Id.* at 50–51.  Furthermore, the ALJ determined that the evidence failed to establish the presence of the "paragraph C" criteria.[10]  He

---

[9] "Paragraph B of each listing . . . provides the functional criteria . . . to evaluate how [a] mental disorder limits [one's] functioning." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.00.A.(2.b.  These functional criteria represent the four areas of mental functioning: (1) understanding, remembering, or applying information, (2) interacting with others, (3) concentrating, persisting, or maintaining pace, and (4) adapting or managing oneself.  *Id.*  "To satisfy the paragraph B criteria, [one's] mental disorder must result in "extreme" limitation of one, or "marked" limitation of two, of the four areas of mental functioning."  *Id.*

[10] Paragraph C provides the criteria used "to evaluate serious and persistent mental disorders." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.00.A.2.c.  "To satisfy the paragraph C criteria, your mental disorder must be 'serious and

reasoned that, other than a consultative psychiatric examination on May 16, 2019, with Kelsey

Ball, Ph.D., her "mental status exams showed fair judgment and insight" and that Plaintiff had

"testified that she uses public transport independently, goes to the library, attends religious

services, and socializes with friends on a consistent basis." *Id.* at 51.

        2.      Plaintiff's RFC

        The ALJ found that Plaintiff's impairments left her with the RFC to perform light work

as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except that she could only occasionally

climb ramps or stairs, balance, stoop kneel, crouch, and crawl; could never climb ladders, ropes,

and scaffolds; must avoid concentrated exposure to extreme cold, wetness, excessive vibration,

hazardous moving machinery, and unprotected heights; could perform simple, routine, repetitive,

low stress (no strict production quotas, no assembly line pace work) work involving occasional

interaction with supervisors, co-workers, and the general public; and could tolerate occasional

changes in a routine work setting. *Id*. at 51–52. The RFC contained no restriction with respect

to breaks to use the bathroom. *Id.*

        In determining Plaintiff's RFC, the ALJ stated that he considered all of Plaintiff's

symptoms and the extent to which they reasonably could be accepted as consistent with the

objective medical evidence, medical opinions, and other evidence in the record. *Id.* at 52. In

considering Plaintiff's symptoms, the ALJ undertook a two-step process. *Id.* First, he determined

that Plaintiff's medically determinable impairments could reasonably be expected to cause the

alleged symptoms. *Id.* However, the ALJ then found that Plaintiff's statements concerning the

---

persistent,'; that is, there must be a medically documented history of the existence of the disorder over a period of at least 2 years, and evidence that satisfies the criteria in both C1 and C2." *Id.* The criterion in C1 is satisfied when the evidence shows that the claimant relies, "on an ongoing basis, upon medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s), to diminish the symptoms and signs" of his or her mental disorder. 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.00.G.2.b. "The criterion in C2 is satisfied when the evidence shows that, despite [the claimant's] diminished symptoms and signs, [he or she has] achieved only marginal adjustment." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.00.G.2.c

intensity, persistence, and limiting effects of her symptoms were inconsistent because the objective medical evidence and other evidence in the record, when considered in their "totality," indicated that her impairments were not disabling. *Id.* at 52–53.

As to Plaintiff's physical limitations, the ALJ noted that a CT scan of her abdomen and pelvis in November 2018 showed a urethrovaginal fistula, and a cystogram and retrograde urethrogram confirmed the presence of a ureteral fistula. *Id.* at 53 (citing ECF No. 5-10 at 96; ECF No. 5-14 at 59). Further, he noted that a May 2019 x-ray showed a urethral fistula. *Id.* (citing ECF No. 5-7 at 32). Thereafter, the ALJ noted evidence from the record that supported an improvement of Plaintiff's physical conditions. A CT scan in July 2019 of her abdomen and pelvis was "unrevealing." *Id.* (citing ECF No. 5-7 at 279). An August 2019 evaluation by Michael Phillips, M.D., showed no obvious signs of spontaneous leakage in the space between Plaintiff's neovagina and the urethra and no leakage per the neovagina. *Id.* (citing ECF No. 5-7 at 262). A subsequent fluoroscopy study in September 2019 failed to demonstrate persistence of the urethra vagina fistula, and there was no evidence of ongoing drainage from the fistulous tract. *Id.* (citing ECF No. 5-7 at 259, 261). Similarly, a December 2019 retrograde urethrogram and cystoscopy showed a closed urethral neo-vaginal fistula. *Id.* at 54 (citing ECF No. 5-7 at 252). In February 2020, an examination by Vincent Obias, M.D., again noted no evidence of fistulas. *Id.* (citing ECF No. 5-7 at 252). Finally, a CT scan of Plaintiff's abdomen and pelvis in August 2021 showed a tiny umbilical hernia but an otherwise normal urinary bladder. *Id.* (citing ECF No. 5-14 at 89). The ALJ also found that there was no indication that Plaintiff's conditions had worsened between the date of the alleged onset of disability—October 30, 2018—and the date of the second hearing on February 22, 2023. *Id.*

The ALJ also considered the medical opinions and prior administrative medical findings in the record. *Id.* at 55–56. Among those opinions, the ALJ found the opinions of the State Agency medical consultant at the reconsideration level, Dr. Nelson-Desiderio, persuasive. *Id.* That consultant had opined that Plaintiff was limited to a light exertional level, an assessment that the ALJ found was supported by the consultant's analysis of the record and consistent with other record evidence, including that Plaintiff had a normal gait and had "maintain[ed] fairly extensive physical activities of daily living," and the fact that State agency physicians had found that Plaintiff was capable of at least light work. *Id.* Thus, the ALJ found Plaintiff capable of light exertion in her RFC. *Id.*

Among the medical opinions the ALJ considered with respect to Plaintiff's mental limitations was the opinion of Kelly Chiles, M.D., who stated that claimant is unable to work. *Id.* at 56. The ALJ gave no weight to that opinion because the "[d]isability is a legal determination reserved to the Commissioner." *Id.* The ALJ found, however, that Dr. Chiles's opinion that Plaintiff was seriously compromised in her ability to work substantially persuasive because it was consistent with the record; the ALJ observed that his determination of Plaintiff's RFC—which permitted only light exertion—reflected this serious compromise in her ability to work. *Id.* Finally, the ALJ found Dr. Chiles's opinion that claimant was not able to function independently outside of the home unpersuasive because "among other activities, the claimant is able to take public transportation on her own." *Id.*

Ultimately, to accommodate Plaintiff's physical impairments into her RFC the ALJ imposed only a light work restriction because the ALJ found she had maintained "fairly extensive physical activities consistent with light exertion," including microwaving foods, taking the subway, cooking, washing laundry, going to the library, attending religious services, grocery

shopping, and cleaning her home. *Id.* at 54 (citing ECF 5-2 at 66–97; ECF 5-7 at 4, 7, 66, 286–325). He also observed that she had retained a normal gait. *Id.* (citing ECF No. 5-7 at 14, 123, 448; ECF No. 5-14 at 10, 139, 171; ECF No. 5-15 at 16). He further noted that State agency physicians who had examined Plaintiff had found her capable of at least light work. *Id.* (citing ECF No. 5-3 at 14–26, 28–42).

Specifically with respect to Plaintiff's claim that she was incontinent, the ALJ found that she had attained continence when her urethrovaginal fistula healed within 12 months of its initial occurrence. *Id.* (citing ECF No. 5-7 at 251–78; ECF No. 5-11 at 306, 340, 686). The ALJ noted that once continence was attained, Plaintiff's nephrostomy tubes were removed on December 20, 2019. *Id.* The ALJ also pointed to Plaintiff's testimony, noting that Plaintiff was "able to sit in an automobile without a restroom during trips to Tampa, Florida, and Greenville, North Carolina, in 2022." *Id.* at 54–55 (citing ECF No. 5-2 at 66–97). For these reasons, the ALJ concluded that the Plaintiff did not require any more bathroom breaks at work than the typical worker and included no restriction in her RFC to account for incontinence. *Id.* at 55.

### 3.  Conclusion of the Five-Step Sequential Inquiry

At step four, the ALJ determined that Plaintiff had past relevant work as a receptionist, motor vehicle dispatcher, food service worker, and cafeteria counter attender. *Id.* at 57. Based on the VE testimony, the ALJ concluded that Plaintiff was unable to perform past relevant work as actually or generally performed. *Id.*

At step five, the final step of the analysis, the ALJ found that there were jobs available in significant numbers in the national economy that Plaintiff could perform based on the VE's testimony that an individual with claimant's age, education, work experience, and RFC would be

able to perform the requirements of occupations such as a routing clerk, marker, and collator operator. *Id.* at 57-58.

Accordingly, the ALJ concluded that Plaintiff was not disabled from October 30, 2018, through the date of his decision on March 2, 2023. *Id.* at 58.

## II.     LEGAL STANDARD

A federal district court has jurisdiction over a civil case challenging a final decision of the Commissioner.  42 U.S.C. § 405(g).  A reviewing court must affirm the Commissioner's decision if it is based on substantial evidence in the record and the correct application of the relevant legal standards.  *Id.*; *Butler*, 353 F.3d at 999.

"[T]he plaintiff bears the burden of demonstrating that the Commissioner's decision is not based on substantial evidence or that incorrect legal standards were applied." *Lane-Rauth v. Barnhart,* 437 F. Supp. 2d 63, 64 (D.D.C. 2006).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  It requires "more than a scintilla [of evidence] but can be satisfied by something less than a preponderance of the evidence." *Fla. Mun. Power Agency v. FERC*, 315 F.3d 362, 365–66 (D.C. Cir. 2003) (quoting *FPL Energy Me. Hydro LLC v. FERC*, 287 F.3d1151, 1160 (D.C. Cir 2002)).

Ultimately, the substantial evidence standard is a "low bar," *La. Pub. Serv. Comm'n v. FERC*, 20 F.4th 1, 7 (D.C. Cir. 2021), and "requires considerable deference to the decision rendered by the ALJ," *Crosson v. Shalala,* 907 F. Supp. 1, 3 (D.D.C. 1995); *see also Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) ("[W]hatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency [under the substantial evidence standard] is not high.").  The reviewing court may neither reweigh the evidence presented to it nor replace the Commissioner's

judgment "concerning the credibility of the evidence with its own." *Crosson,* 907 F. Supp. at 3; *see also Butler,* 353 F. 3d at 999 (finding that the district court's role is not to reweigh the evidence but only to determine whether the ALJ's findings are "based on substantial evidence and a correct application of the law"). However, "this standard of review requires the Court to carefully scrutinize the entire record to ensure that the Commissioner, through the ALJ, has both analyzed all of the evidence available and has sufficiently explained his/her reasoning and the weight given to the facts." *Pinkney v. Astrue,* 675 F. Supp. 2d 9, 14 (D.D.C. 2009); *see also Lane-Rauth*, 437 F. Supp. 2d at 65 ("[T]his standard of review 'calls for careful scrutiny of the entire record,' to determine whether the Commissioner, acting through the ALJ, 'has analyzed all evidence and has sufficiently explained the weight he has given to the obviously probative exhibits[.]'"(second alteration in original) (quoting *Butler,* 353 F. 3d at 999)). In applying this standard, courts "must also be mindful of the harmless-error rule. Consequently, even if [the court] perceive[s] error," it must affirm the Commissioner's decision unless the error is prejudicial." *Saunders v. Kijakazi*, 6 F. 4th 1, 4 (D.C. Cir. 2021).

Finally, the Court's job is to "consider the grounds actually proffered by the ALJ" rather than to make those determinations for itself, *Ward v. Berryhill,* 246 F. Supp. 3d 202, 210 (D.D.C. 2017), or credit "post-hoc rationalization[s]" advanced by the parties, *Cooper v. Berryhill,* No. 16-cv-1671, 2017 WL 4326388, at *5 (D.D.C. Sept. 28, 2017); *see also SEC v. Chenery Corp.*, 332 U.S. 193, 196 (1947) (holding that a reviewing court "must judge the propriety of [an agency's judgment] solely by the grounds invoked by the agency"); *Jones v. Astrue*, 747 F.3d 350, 356 (D.C. Cir. 2011) (citing *Chenery,* 332 U.S. at 196).

### III.    DISCUSSION

Among other arguments, Plaintiff contends that the ALJ committed two principle errors: (1) he ignored or mischaracterized her testimony concerning her activities of daily living, tolerance for socialization, and her incontinence in the aftermath of her surgery; and (2) he failed to evaluate more recent medical evidence concerning the persistence of her incontinence years after her surgery.   ECF No. 11 at 44–45.   The Court agrees with both claims of error and finds them sufficient to justify remand in this case.   Because the resolution of those errors on remand may impact Plaintiff's other arguments raised on appeal, the Court does not further address them here.

### A.    The ALJ Ignored or Misstated Plaintiff's Testimony

Plaintiff argues that the ALJ ignored or misstated her testimony regarding her daily activities, her tolerance for socialization, and her incontinence arising from complications following her surgery.  *See id.* at 26–29, 32–33.  The Court agrees.

Generally, while this Court must maintain a deferential standard of review, "remand is warranted where an ALJ mischaracterizes evidence that was presented."  *Stubbs v. Saul*, No. 18-cv-1457, 2020 WL 1893173 at *6 (D.D.C. Mar. 23, 2020), *report and recommendation adopted*, 2020 WL 1891979 (D.D.C. Apr. 15, 2020).   Specifically with respect to consideration of a claimant's ability to carry out daily activities, the ALJ must fairly summarize the evidence concerning those activities and any material contextual details in which they occur, particularly when the record shows that they are carried out with assistance or in a limited fashion.  *See Emery P. v. Kijakazi*, No. 21-cv-3147, 2023 WL 5973991, at *7 (D.D.C. Sept. 14, 2023) (remanding the ALJ's RFC determination for further proceedings when the ALJ's characterizations of the plaintiff's activities omitted significant contextual details).  For example, in *Stubbs*, the court found that the ALJ misstated the record by ignoring the "limited manner" in which the plaintiff carried

out daily activities and the assistance that she required in doing so.  *Stubbs*, No. CV 18-01457, 2020 WL 1893173 at *6.  Whereas the ALJ stated that the plaintiff "could use public transportation, perform light housework, go shopping, and attend church on her own," the record showed that she had a "home aide help around the house three times a week," microwaved meals instead of cooking, did her grocery shopping online or by mail, went to church "when [she] ha[d] help," and used Metro Access (a public transportation system for people with disabilities).  *Id.* (emphasis omitted).  Similarly, in *Jackson v. Barnhart*, the court found that the ALJ improperly ignored the limited fashion in which plaintiff engaged in daily activities.  *See* 271 F. Supp. 2d 30, 37 (D.D.C. 2002).  There, the ALJ relied on a form completed by the plaintiff that listed daily activities such as "performing some household chores, walking her daughter to school, attending church, volunteering at a daycare facility, grocery shopping, listening to the radio, and going to the movies."  *Id.*  In doing so, the ALJ ignored the fact that the plaintiff had reported that "she only attends 'the movies' when she feels up to it, washes dishes just twice a week, and rarely leaves the house on other occasions."  *Id.*  The ALJ further ignored that the plaintiff had, on both the same form and in her testimony, indicated that her physical activities had changed after she became disabled.  *Id.*

Here, the ALJ similarly misstated the record evidence concerning Plaintiff's daily activities.  He found that Plaintiff "maintains fairly extensive physical activities," namely that she "remains able to microwave foods, ride on the subway alone, cook, wash laundry by hand, manage money, go to the library, attend religious services, grocery shop, wash laundry at the laundromat, and clean."  ECF No. 5-2 at 50, 54 (citing Hearing Testimony, ECF No. 5-7 at 4, 7 (consultative examination report of Dr. Ball), 184 (MBI Health Services treatment record from January 24, 2020); ECF No. 5-6 at 42–49 (third-party function report)).  While the ALJ cited Plaintiff's

February 2022 hearing testimony to support his assessment of her daily activities, what Plaintiff

stated during the hearing is that she "does not take public transportation," and had not taken the

subway in one to one and a half years or a bus in one to two years.  ECF No. 5-2 at 74, 80–81.[11]

Further, she stated that she does not cook other than microwaving, uses plastic utensils and paper

plates rather than washes dishes by hand, only rarely cleans, and does not vacuum or sweep.  *Id.*

at 78–80.  As for laundry, she testified that she either has someone do it for her or she gets a ride

to the laundromat.  *Id.* at 79.  Similarly, she testified that she no longer goes to the library and

could only go to the grocery store or attend religious services when driven by her niece or friend.

*Id.* at 74, 79, 81.  Thus the ALJ misstated the Plaintiff's testimony, or ignored important context,

when he relied on her hearing testimony to find that she "testified that she takes public

transportation, cooks, cleans, . . . goes to the library, attends religious services and shops for

groceries."  *Id.* at 51 (citing Hearing Testimony).

Likewise, her testimony provides no support for the ALJ's assertion that Plaintiff "stated

that she socializes with friends on a regular basis and has no problems being in public by herself."

ECF No. 5-2 at 51 (citing Hearing Testimony, ECF No. 5-7 at 4–9 (consultative examination report

of Dr. Ball), 119–246 (MBI Health Services treatment records from November 2019 to May 2020);

ECF No. 5-13 at 164–235 (MBI Health Services treatment records from July 1977 to April 2021)).

In fact, Plaintiff testified that she has a fear of "[b]eing around people," thought she did "not [get

along] so well" with people, and spends her "typical day . . . [i]n the bed."[12]  *Id.* at 80, 81.  She

also stated that she no longer took public transportation because "every time [she is] around a

---

[11] She stated that she does not do so because "every time [she is] around a crowd, [she] tend[s] to sweat[,] [her] anxiety goes up[, and she] just get[s] really nervous."  *Id.* at 81.

[12] Plaintiff was also asked by the ALJ, "do you have any hobbies that you pursue?"  ECF No. 5-2 at 75.  She answered, "I used to. I don't have them anymore."  *Id.*

crowd, [she] tend[s] to sweat[,] [her] anxiety goes up[, and she] just get[s] really nervous." *Id.* at 78, 81.  As a result, she "tr[ies] to stay away from people a lot . . . [because] the least littlest thing can . . . trigger [her] . . . [and] make [her] want to do something harmful to them. . . ." *Id.* at 85. That is a far cry from the ALJ's assertion that Plaintiff testified that "she uses transportation independently . . . and socializes with friends on a consistent level basis." *Id.* at 51 ("The claimant testified that she uses public transportation independently . . . and socializes with friends on a consistent basis (Hearing Testimony).").

Nor does the ALJ's assertion that Plaintiff "maintains fairly extensive physical activities" and "has no problems being in public by herself" find support in the other portions of the record the ALJ cited.  ECF No. 5-2 at 51, 54.  Besides Plaintiff's hearing testimony, the ALJ relied for these findings on a May 2019 Psychiatric Evaluation from Kelsey Ball, Ph.D, a January 2020 MBI Health Services treatment note, and a July 2019 function report.  Taking these records in reverse order, the July 2019 function report—which is a third-party report offered by someone who knows Plaintiff, ECF No. 5-6 at 42–49—provides no support for the ALJ's findings; indeed, it is entirely consistent with Plaintiff's hearing testimony that her daily activities and tolerance for socialization were very limited.  The report states that *before* her surgery Plaintiff was able to work, cook, grocery shop on her own, wash dishes and clean her apartment, but *after* her surgery she was no longer able to shop, prepare food for herself other than in the microwave, or do household chores without assistance.  *Id.* at 43.  Much like her hearing testimony, the report also states that Plaintiff no longer spends time with others or "want[s] to do anything."  *Id.* at 47.  The January 2020 MBI Health Services treatment note simply acknowledges that Plaintiff went to the library to meet with her social worker.  ECF No. 5-7 at 184.  Traveling to meet with your therapist for a coping session is hardly indicative of a claimant's day-to-day abilities of exertion or interaction.  *See Jackson,*

271 F. Supp. 2d at 37 (ALJ ignoring "the *limited* fashion the plaintiff engages in some of the activities she described" warranted remand (emphasis in original)).  The May 2019 psychiatric evaluation, on the other hand, provides a more mixed picture.  *See generally* ECF No. 5-7 at 4–12.  While it reports that Plaintiff could bathe and dress herself, cook simple foods, socialize with friends, and manage her money, it also states that her symptoms of anxiety often prevent her from getting on public transportation and that she has "no enthusiasm to do anything" and "spends her days laying in bed or watching TV in the house."  *Id.* at 7.  More, the note reflects an assessment conducted by the consultative examiner in May 2019, only months after Plaintiff's surgery—her nephrostomy tubes were not removed until seven months later in December 2019.  ECF No. 5-2 at 50.  As Plaintiff explained during the hearing in February 2022, her lack of desire "to do anything" goes "back to the trauma that [she] experienced" following an arduous *year* of recovery after her surgery:

> It[] go[es] back to, just experiencing . . . a whole year with tubes coming out of me and I had to . . . urinate in a bag for, like, a whole year and some months. . . .  I think about all of that and it makes me depressed.  It makes me feel like—like, this is something that I wanted all my life, ever since I can remember, this is something that I wanted and it makes me feel like I wish I would've never done it or I wish I could've reversed the process, so I wouldn't have to go through this.  And it just makes me feel like a lot of times, like, I don't want to be here . . . I just feel like—I just feel like I want to die.

ECF No. 5-2 at 84–85.  The ALJ's decision is silent about this context that Plaintiff offered in her testimony and the timeline it provides as to the progression of her impairments in the long aftermath following her surgery.[13]  The Court cannot say that these omissions and misstatements

---

[13] Plaintiff's testimony also finds support in the records of her treating providers at MBI Health Services which describe how she experiences "all types of negative thoughts or feelings" or "nothing" at all, ECF No. 5-7 at 142, 161; how she "[does not] get up because [she] do[es not] feel like moving or getting dressed," ECF No. 5-13 at 178; how she attempted suicide, most recently in July 2020, ECF No. 5-7 at 187, ECF No. 5-13 at 177; and how she feels aggression towards others and has "thoughts of hurting people," ECF No. 5-13 at 177.

in the ALJ's decision concerning Plaintiff's limited daily activities and tolerance for socialization were harmless error as he repeated them, in one form or another, nine times throughout his analysis, including when finding that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of the listings, *see id.* at 50–51, when assessing the credibility of Plaintiff's statements concerning her symptoms, *see id.* at 52, and when determining Plaintiff's RFC, *see id.* at 54–56.

Similarly, the ALJ misstated or ignored Plaintiff's testimony concerning her incontinence in the years following her surgery. *Id.* at 54–55. As part of his determination that Plaintiff was no longer incontinent after the healing of her urethrovaginal fistula by December 2019, the ALJ found that Plaintiff "does not require any more bathroom breaks at work than the typical worker" because, among other things, she "was able to sit in an automobile without a restroom during trips from Washington, DC, to Tampa[,] Florida and Greenville, North Carolina in 2022." *Id.* In support of this finding concerning the car trips, the ALJ cited only Plaintiff's hearing testimony. *Id.* But Plaintiff said no such thing at the hearing. Rather, she testified that during the long car trips in 2022 she laid, rather than sat, in the backseat of the car,[14] and needed to ask the driver to pull over "probably every hour" so that she could use the restroom. *Id.* at 76. Moreover, when Plaintiff was asked at the hearing in 2023 how frequently she typically goes to the bathroom during the day, she responded "like, every 30 to 45 minutes." *Id.* Again, the Court cannot say that the omission of that testimony from the ALJ's decision—and misstatement of Plaintiff's testimony concerning her need to use the restroom during the car trips—was harmless error. Indeed, the VE testified that, because of productivity demands, there are no jobs available in the national economy for an

---

[14] It appears from Plaintiff's testimony that she laid, rather than sat, in the backseat of the car, either because of pain in her groin as a result of her surgery, *see* ECF No. 5-2 at 76, or because "if [she is] sitting for a long period of time, [she] can kind of feel that [she] has to use the bathroom, but soon as [she] stand[s] up, it just comes out," *id.* at 83.

individual who needs a ten-minute restroom break approximately every 45 minutes throughout the workday. *Id.* at 95 ("One would not be able to keep up with productivity expectations, if one was walking away from the workstation every 45 minutes, 10 minutes each time, and that's in addition to regularly scheduled breaks."). Plaintiff's testimony at the hearing concerning her restroom frequency—if fairly characterized and believed—would fall within that limitation.

The ALJ's omissions or outright misstatements of Plaintiff's testimony provide a sufficient basis to vacate his decision. On remand, the ALJ should accurately characterize and fairly consider Plaintiff's testimony about her daily activities, her tolerance for socialization, and her incontinence in the aftermath of her surgery.

**B.      The ALJ Ignored Contradictory Medical Evidence Regarding Plaintiff's Incontinence**

Plaintiff also argues that the ALJ ignored contradictory medical evidence when he determined that Plaintiff attained continence when her urethrovaginal fistula healed by December 2019. ECF No. 11 at 33. Again, the Court agrees with Plaintiff.

In deciding whether a claimant is disabled, an ALJ must explain how he or she considered and resolved any "'material inconsistencies or ambiguities' evident in the record, as well as the reasons for rejecting medical opinions in conflict with the ultimate RFC determination." *Butler,* 353 F.3d at 1000 (quoting Social Security Ruling ("SSR") 96-8, 1996 WL 374184, at *7 (S.S.A. July 2, 1996)); *see Godbey v. Apfel,* 238 F.3d 803, 808 (7th Cir. 2000) ("While the ALJ need not articulate his reasons for rejecting every piece of evidence, he must at least minimally discuss a claimant's evidence that contradicts the Commissioner's position."). The ALJ may not ignore relevant contradictory evidence indicating that a claimant had significant physical limitations that, if accepted, would substantially erode the claimant's capacity to perform work. *See Ray v. Astrue*, 718 F. Supp. 2d 65, 75 (D.D.C. 2010) (reversing and remanding where the ALJ ignored

contradictory evidence that, if accepted, would substantially erode the claimant's capacity for performing light or sedentary work, and did not explain his reasoning for doing so).

The ALJ ran afoul of these principles here.  In determining that Plaintiff was not disabled, the ALJ found that she "attained continence when her urethrovaginal fistula healed within 12 months of its initial occurrence," that is, by December 2019.  ECF No. 5-2 at 54; *see also id.* at 50 ("A retrograde urethrogram and cystoscope in December 2019 showed a closed urethral neo-vaginal fistula. . . . Once the fistula healed, she was continent.").  Relying upon this conclusion, the ALJ determined that her incontinence was not a severe impairment at step two, and did not account for any alleged incontinence in her RFC.  *See* ECF No. 5-2 at 50, 51–52, 54–56.

In reaching the conclusion that Plaintiff's incontinence abated by the end of 2019, the ALJ cited treatment records from George Washington University Medical Faculty Associates dating from as late as February 2020 (Exhibit 6F) and medical records from George Washington University Hospital dating from as late as March 2021 (Exhibit 15F).  *Id.* at 54; *see generally* ECF Nos. 5-7 at 247–85, and 5–11.  However, the ALJ's analysis did not address more recent George Washington University Hospital records from August 2021 indicating that Plaintiff was experiencing pelvic pain, urinary urge frequency, and incontinence years after the healing of her urethrovaginal fistula in 2019.  Specifically, those records show that Plaintiff was referred by her primary care physician, Dr. Barbara Lewis, for a course of physical therapy to address her pelvic floor pain and weakness.  ECF No. 5-15 at 78.  The records reflect that her chief complaint was pelvic pain, stress urinary incontinence ("SUI), and urinary urge incontinence ("UUI").  *Id.* at 74. Upon initial examination by the physical therapist on July 26, 2021, Plaintiff was diagnosed with "[p]elvic and perineal pain" and "[o]ther specified urinary incontinence."  *Id.*  Thereafter, Plaintiff attended over a month of physical therapy sessions that appear to have been largely unsuccessful.

*Id.* at 59–66; ECF No. 5-16 at 1–9.   During the last therapy session reflected in the record on August 30, 2021, Plaintiff reported that while she had "less severe pain with sitting," her "pain with walking [was] still the same and [was] in the suprapubic area."  ECF No. 5-15 at 58.  She also reported that while she "had some improvements in urinary leakage," she still "has to go to the bathroom every 30 minutes."  *Id.*  Plaintiff's reported symptoms were substantiated by the physical therapist's abnormal findings upon external vaginal examination of "[tenderness to palpation] throughout superficial transverse perineal muscle[;] limited myofascial excursion thought B labia[;] positive Ely's test B[;] limited hip extension[;] and suprapubic pain reproduced with knew flexion in prone."  *Id.*  They were also consistent with Plaintiff's testimony concerning her pelvic pain and continued incontinence 18 months later at the administrative hearing.[15]

The government concedes that the ALJ did not address these records in his decision but asserts that the omission provides no a basis for remand because the records reflect only Plaintiff's subjective "complaints" of incontinence that are unworthy of credence because they were not associated with objective findings.   ECF No. 15 at 18.  Setting to the side the relative rarity, in the Court's estimation, of individuals lying about being incontinent, the records do not reflect Plaintiff's mere random remarks during the course of treatment for other ailments.  Rather, they show her consistent reporting and requesting treatment for incontinence and pelvic pain, a medical diagnosis of incontinence and pelvic pain, a referral by her primary care physician to treat those

---

[15]  At the February 2023 hearing, when asked the symptoms of her surgery that she was still experiencing, she responded:

> Well, I still feel pain down in the vaginal area . . .  I normally wet myself a lot.  Like, if I'm out, I can't really hold . . . my bladder, so I kind of normally wet myself a lot, but I try to wear, like pads and things, but that doesn't work. . . . The incontinence part, normally, is . . . if I'm moving around a lot, then I have to urinate a lot, but, like if I'm sitting for a long period of time, I can kind of feel that I have to use the bathroom, but soon as I stand up, it just comes out.

ECF No. 5-2 at 82–83.  When asked how frequently she goes to the bathroom during the day, she testified "[l]ike, every . . . 30 to 45 minutes."  *Id.* at 83.

conditions, over a month of physical therapy to address them, and abnormal, objective findings by the physical therapist following a vaginal examination. If anything, what is hard to believe is the government's implicit suggestion that it is a mystery as to what could be causing any incontinence Plaintiff may be experiencing. Perhaps the cause is her gender affirming/reassignment surgery which appears to have caused complications related to incontinence from the start.

In any event, an ALJ must explain how he or she considered and resolved any "'material inconsistencies or ambiguities' evident in the record . . . ." *Butler*, 353 F.3d at 1000 (quoting SSR 96-8, 1996 WL 374184, at *7); *see Godbey,* 238 F.3d at 808 ("While the ALJ need not articulate his reasons for rejecting every piece of evidence, he must at least minimally discuss a claimant's evidence that contradicts the Commissioner's position."). The ALJ failed to do so here. Because the George Washington University Hospital records from August 2021 contradict the ALJ's finding that Plaintiff "attained continence when her urethrovaginal fistula healed" by the end of 2019, and because, based on the VE's testimony, they may support a finding that Plaintiff was disabled because she needs a restroom break every "every 30 minutes," the ALJ should not have entirely ignored them. *Ray*, 718 F. Supp. 2d at 75–76 (reversing and remanding where the ALJ ignored contradictory evidence that, if accepted, would substantially erode the plaintiff's capacity for performing work, and did not explain his reasoning for doing so). Remand is thus warranted for the ALJ to address this contradictory medical evidence in determining the extent of Plaintiff's incontinence and its impact on her ability to find employment.

## IV.    CONCLUSION

For the reasons provided above, the Court will enter an order **GRANTING** Plaintiff's motion for judgment of reversal to the extent that it seeks remand to the SSA for further administrative proceedings, ECF No. 5-11, and **DENYING** Defendant's motion for judgment of

affirmance, ECF No. 5-15.  The ALJ shall reassess Plaintiff's disability claim consistent with this Memorandum Opinion.


Date: August 9, 2024

_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE